UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA                 CASE NO. 22-cr-00197

VERSUS                                   JUDGE ELIZABETH E. FOOTE

HOWARD DAVIS (01)                        MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

### Introduction

Howard Davis ("Defendant") is charged with one count of possession with intent to distribute cocaine. The charge arises out of a traffic stop and search of Defendant's vehicle. Before the court is Defendant's Motion to Suppress (Doc. 22). Defendant argues that all evidence seized as a result of the stop should be suppressed because the stop was unlawfully extended. For the reasons that follow, it is recommended that the motion be denied.

### Relevant Facts

A hearing was held on the motion to suppress. The testimony at the hearing, along with dash cam footage of the traffic stop, established the following facts. At around 5:00 a.m. on August 2, 2022, Trooper Justin Wardell of the Louisiana State Police was on patrol on I-20 in Webster Parish. He was in his patrol car positioned at the bottom of a hill. He saw a Honda Accord drive over the hill in the left lane. Tr. 9-10. When the Accord was in view of Wardell's patrol car, it immediately moved to the right lane right behind a van.

Wardell estimated that the Accord was only one car length behind the van, which was an unsafe distance.  Tr. 13.

Wardell watched the Accord for about half a mile, and it stayed within one car length of the van in front of it in violation of La. R.S. 32:81, following to closely.  Tr. 15.  Wardell put his car into drive, waited for traffic to pass, and pulled out onto the interstate.  He had to pass about 20 or 25 vehicles to catch up to the Accord.  Tr. 16.  As he was driving through the traffic, Wardell looked at his computer and saw that the license plate reader ("LPR") mounted on his vehicle captured the Accord's license plate when it passed.  He ran the plate and learned that it was a North Carolina plate issued to a Ms. Bullock.  Tr. 17. He checked other LPR databases, which showed that the Accord was in North Carolina the day prior to the stop, then in Dallas, Texas the night before the stop.  Tr. 18.

Wardell began to catch up to the Accord, which had moved back into the left lane and was driving normally.  Tr. 19.  There were no cars in front of it in that lane.  As Wardell got closer, the Accord suddenly braked and got back in the right lane, again getting too close to the car ahead of it.  Wardell did not see anything that would have caused the car to brake and change lanes so suddenly.  Tr. 20.

Once Wardell was immediately behind the Accord, he activated his emergency lights.  Once the two cars pulled off the interstate, Wardell exited his patrol car and approached the passenger side of the Accord.  Tr. 21.  He introduced himself to Defendant and explained that he pulled Defendant over for following too closely.  Defendant provided his driver's license, which was issued out of North Carolina.  Tr. 22.  Wardell told

Defendant that the car was registered to a Ms. Bullock, and Defendant said she was his wife. Tr. 23. Defendant later stated that they were engaged. Tr. 23.

Defendant gave Wardell his insurance information and registration. The registration he gave Wardell expired in 2011 and was issued to someone other than Ms. Bullock. Defendant searched the vehicle for the current registration, and Wardell began to make small talk. Tr. 23. Defendant told Wardell that he lived in North Carolina and was in Shreveport visiting a friend. Defendant said that he had been in Shreveport for two to three days, but this contradicted the LPR data that showed the vehicle had been in Dallas the night before. Tr. 24.

Wardell asked more questions about Defendant's visit, and Defendant became nervous. Defendant could not name the neighborhood his friend lived in or the name of the street his friend lived on. He later said that his friend's mom had cancer and that he was going to see her. Tr. 25.

As he was talking to Defendant, Wardell could smell the overwhelming odor of air fresheners. He looked at the inside of the vehicle through the window and saw a large Black Ice Christmas Tree air freshener on the dashboard. There were two air fresheners on the C-pillar and one above the trunk area between the headrest and the seat. He also saw empty energy drink cans. Tr. 26-27.

As Defendant continued to search for the current registration, Wardell returned to his patrol vehicle. He radioed dispatch for a driver's license, criminal history, and registration checks. He then began to run checks on his computer. He found that Defendant

had a criminal history, including charges for trafficking cocaine, illegal firearm possession, flight from police, and resisting an officer.   Tr. 28.

When Wardell first got back in his patrol car, he asked Trooper Cahn to come to the stop.  After seeing Defendant's criminal history, Wardell also radioed Trooper Derrick, a K-9 handler, to come to the stop.  Tr. 29.  Wardell decided that he was going to search Defendant's car and started filling out a consent form.  Tr. 30.

Wardell went back to Defendant's car.  Defendant was on a call with Ms. Bullock, who was telling him where to find the registration.  Wardell asked Ms. Bullock about the vehicle, and she said she had it for years but just recently got it reregistered.  Tr. 32. Defendant located the registration and gave it to Wardell.  It was registered to Ms. Bullock 13 days prior to the stop.   From his training and experience, Wardell knew that drug-trafficking organizations will use the same vehicle to travel but will frequently reregister the plate to evade LPRs.  Tr. 33.

Wardell took the registration back to his patrol car.  Dispatch contacted Wardell and confirmed Defendant's criminal history.  Tr. 33.  Wardell contacted Trooper Cahn, the K-9 handler, who said he was close to the scene.  Wardell then returned to Defendant and asked Defendant to come to the back of his vehicle.  Defendant consented to a pat-down search.  Defendant was wearing Saran Wrap as a belt and told Wardell that he was in a hurry to leave his house and forgot his belt.  Tr. 34-35.

Wardell again asked Defendant about his travel plans.  Defendant said he was visiting his friend's mother in the hospital but could not give the name, location, or physical description of the hospital.  Tr. 35.  Wardell asked Defendant why the LPR showed that

the vehicle had been in Dallas the night before. Defendant responded that he was in Shreveport and Dallas. Tr. 36.

Wardell asked for consent to search the vehicle at about 8:28 a.m., and Defendant denied consent. Wardell told Defendant that he was detained so that a K-9 handler could perform an open-air sniff. He told Defendant that he did not think Defendant was being truthful, and Defendant responded, "Yes, sir." Tr. 37. Wardell asked Defendant to empty his pockets. Defendant pulled out a large amount of cash from his front pockets. Tr. 38.

Trooper Derrick arrived at the scene about eight minutes after Defendant denied consent to search. Derrick and his K-9, Migo, performed an open-air sniff and Migo alerted to the right side of the vehicle. Tr. 39. Wardell and Trooper Cahn then searched the vehicle. Located in the trunk was a red bag that contained approximately 4.5 kilograms of cocaine. Tr. 40-41.

**The Motion to Suppress**

Defendant asserted in his original motion to suppress that the traffic stop was not justified at its inception. However, in his post-hearing brief, defendant does not challenge the legality of the stop or the search of the vehicle. Instead, he argues that the stop was pretextual and was unreasonably extended without reasonable suspicion to believe that Defendant was engaged in criminal activity. Defendant argues that all evidence seized as a result of the extended stop should be suppressed.

**Law and Analysis**

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v.

Ohio, 392 U.S. 1 (1968)." United States v. Rosales-Giron, 592 Fed. Appx. 246, 250 (5th Cir. 2014); quoting United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id. Only the second Terry prong is at issue here.

An officer's actions are not reasonably related if the officer detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless the officer develops reasonable suspicion of additional criminal activity in the meantime. United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). If the officer develops reasonable suspicion of additional criminal activity during the investigation of the circumstances that originally caused the stop, the officer may further detain the occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. Id.; United States v. Aguilera, 2014 WL 7404535, at *3 (N.D. Tex.).

An officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop. United States v. Pack, 612 F.3d 341, 349-350 (5th Cir. 2010). The officer may also ask about the purpose and itinerary of the occupant's trip as part of this investigation, because these questions are considered to be reasonably related in scope to the investigation of the circumstances that caused the stop. Id. An officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as the unrelated questions do not extend the duration of the stop. Id.

Defendant argues that the stop was pretextual and that the actual reason for the stop was to conduct a narcotics investigation. Defendant points to Wardell's use of the LPR system to track the vehicle's movements prior to initiating the stop. But an officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses. United States v. Sanchez-Pena, 336 F.3d 431, 437 (5th Cir. 2003), citing Wren v. United States, 116 S.Ct. 1769 (1996).

Defendant also argues that the stop was unlawfully extended to conduct a narcotics investigation. The extension of the stop was justified because Trooper Wardell had reasonable suspicion to believe that Defendant was engaged in criminal activity. Wardell initially decided to stop Defendant for following too closely, and he ran a series of LPR queries as he navigated through traffic to catch up to Defendant. The queries showed that the Accord had traveled from North Carolina to Dallas the day before. Wardell also learned at this time that the vehicle was registered to Ms. Bullock.

After stopping Defendant, Wardell asked him questions about his travel history and the ownership of the vehicle while Defendant searched for his current registration. Defendant first said that Ms. Bullock was his wife, then later said she was his fiancée. Defendant claimed he was in Shreveport to visit a friend, but he could not answer any questions about where the friend lived. Defendant later said that he was visiting a friend's mother in the hospital, but he could not give a name, location, or description of the hospital. Defendant claimed he had been in Shreveport for two or three days, despite the LPR reading showing that the vehicle had traveled from North Carolina to Dallas the day before. While questioning Defendant, Wardell noticed multiple empty energy drink cans as well

as numerous air fresheners located in odd places in the vehicle.  It is well known that those items are commonly found in automobiles of drug couriers.

Defendant continued to look for the current registration while Wardell returned to his patrol car to run checks on the license and vehicle.  Wardell radioed dispatch for a criminal history check.  He then returned to Defendant's vehicle, and Defendant finally located the registration.  Wardell noted that the vehicle had been reregistered, a common tactic of drug traffickers, only 13 days before the stop.

Before Defendant located the current registration, Wardell had ample reasonable suspicion to continue the detention.  Defendant was not able to give details about his visit to Shreveport, was not able to account for the LPR history, gave inconsistent statements about his relationship to the owner of the vehicle, had multiple empty energy drink cans, and had numerous air fresheners scattered throughout the vehicle.  Based on his training and experience, Wardell reasonably believed that Defendant was making what is known in drug interdiction as a "flip trip."   Therefore, Wardell lawfully extended the traffic stop to dispel his reasonable suspicion that Defendant was engaged in drug trafficking.  The extension lasted for only about eight minutes until Migo arrived and alerted to provide probable cause to search the car.

Accordingly,

It is recommended that Defendant's Motion to Suppress (Doc. 22) be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this

report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b).  A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 14th day of February, 2023.

Mark L. Hornsby
U.S. Magistrate Judge